(91 Misc. Rep. 73)

WESTERN NEW YORK WATER CO. v. CITY OF NIAGARA FALLS et al.

(Supreme Court, Equity Term, Niagara County. May, 1915.)

1. EMINENT DOMAIN ⬥84—RIPARIAN RIGHTS—COMPENSATION.

While riparian owners do not own the water of navigable streams, each is entitled to reasonable use of the water, not lessening the flow; and such rights are constitutional property rights, of which the owners cannot be deprived without just compensation.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 227–230; Dec. Dig. ⬥84.]

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. NAVIGABLE WATERS ⬡⟳40—RIGHTS OF RIPARIAN OWNER—INJUNCTION.
   Where a riparian proprietor cannot protect his rights without multi-plicity of suits, or there is danger that a wrongful use will ripen into a prescriptive right, equity will afford injunctive relief.
   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 245; Dec. Dig. ⬡⟳40.]

3. NAVIGABLE WATERS ⬡⟳40—POLLUTION OF STREAMS—RIGHT TO INJUNCTION.
   The defendant city had an intake about 2,000 feet from the shore, whence it led the water to its filtration plant. The water, after filtra-tion, was used to supply the municipality, and much of the filtered water was used to clean the filter, from which large quantities of impurities in solid and offensive form were washed into the stream above plaintiff's intake. Plaintiff had a state and city franchise to take water from the stream to supply the inhabitants of the city. *Held*, that the defendants' acts were continuing trespasses, which would be enjoined.
   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 245; Dec. Dig. ⬡⟳40.]

4. MUNICIPAL CORPORATIONS ⬡⟳838—POLLUTION OF STREAMS—RIGHTS OF MUNICIPALITY.
   A municipality is not entitled to discharge offensive matter from its filter plant into a navigable river, where the plan of the plant was not approved by the state board of water supply, where no certificate, as required by Public Health Law (Consol. Laws, c. 45) § 76, had been ob-tained, and no permit from the War Department had been obtained ac-cording to Act Cong. March 3, 1899, c. 425, § 13, 30 Stat. 1152 (U. S. Comp. St. 1913, § 9918).
   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1787; Dec. Dig. ⬡⟳838.]

5. CORPORATIONS ⬡⟳581—CONSOLIDATION—RIGHT TO QUESTION.
   Only the state may question the validity of the merger of two corpora-tions.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2322–2329; Dec. Dig. ⬡⟳581.]

Action by the Western New York Water Company against the City of Niagara Falls and others. Decree for plaintiff.

Kenefick, Cooke, Mitchell & Bass, of Buffalo (Edward H. Letch-worth, of Buffalo, of counsel), for plaintiff.

Augustus Thibaudeau, of Niagara Falls (Morris Cohn, Jr., of Ni-agara Falls, of counsel), for defendants water commissioners.

Firnum G. Anderson, of Niagara Falls (Morris Cohn, Jr., of Niagara Falls, of counsel), for defendant city of Niagara Falls.

LAUGHLIN, J. This is a suit in equity to enjoin the city of Niag-ara Falls and its board of water commissioners from discharging the waste effluent from the municipal filtration plant into the Niagara river above the intake of the Niagara Falls Power Company, from which as lessee the plaintiff receives and distributes water for drinking and other domestic uses to a large number of the inhabitants of the city of Niagara Falls.

The plaintiff has a franchise from the Legislature of this state and from the former village of Niagara Falls to supply the inhabitants of said former village with pure and wholesome water, and the source of its supply is designated in its franchise from the village as the Niag-

⬡⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ara river. The plaintiff is also the lessee and in possession of lands on the bank of the river under riparian owners, and as such is entitled to the rights of a riparian owner with respect to the waters of the river. See Rathbone v. McConnell, 20 Barb. 311, affirmed 21 N. Y. 466; Bly v. Edison Elec. Ill. Co., 172 N. Y. 1, 64 N. E. 745, 58 L. R. A. 500. The defendants also maintain a water plant for supplying others of the inhabitants of said city with water, and take water from the river some 2 miles above the plaintiff's intake. The defendants take the water from a point some 2,000 feet out in the river, and take it into a filtration plant on the bank, which it constructed in 1912, and there the water passes through the filter, and substantially all of the impurities are separated from the water, and the pure water passes into the service mains and pipes of the city's plant for the use of its consumers, and a large quantity of this filtered water is used daily to wash the filter beds, and all the bacteria and other impurities which have been taken from the raw water in the process of filtration are discharged into the river near the bank.

The evidence tends to show that the quantity of this discharge from the filter beds for the year 1914 was 95,176,800 gallons, or an average of about 260,000 gallons per day, and that the average amount of suspended matter, not including solids in solution, in this effluent from the filter beds, was from 4.56 tons to 8.9 tons per 1,000,000 gallons, and that the defendants also discharge into the river at the same point from 10 to 12 times per annum about 1,000,000 gallons, the contents of each of two sedimentation basins connected with its filtration plant, consisting of bacteria and other impurities separated from the raw water, together with the chemicals added thereto by the defendants, and that the average amount of suspended matter, not including solids in solution, in this discharge is $22^{25}/_{27}$ tons per 1,000,000 gallons, and that from the sedimentation basins alone there are probably discharged into the river annually approximately 550 tons of suspended matter. The defendants add from 125 to 200 pounds of hypochloride, including 30 or 40 pounds of lime, which tends to increase the hardness of the water, to each sedimentation basin, before discharging the contents thereof into the river; and it appears that a less quantity of hypochloride would render the water unpotable. The defendants also add 20 pounds of hypochloride per 1,000,000 gallons to the water used in washing the filter beds. In this manner approximately three tons of hypochloride are discharged in the effluent into the river annually by the defendants. It further appears that about 300 tons of aluminum sulphate are added to the water annually in the coagulating basins at the filtration plant of the defendants and in the effluent discharged into the river. It thus appears that about five-sixths of a ton of chemical matter is discharged into the river daily on an average by the defendants in the operation of its filtration plant. The currents of the river from the point of this discharge to the plaintiff's intake are toward or along the bank, and the flow of the current is upwards of one mile per hour. The average amount of suspended matter in the water at the plaintiff's intake is from two-fifths to one-half a ton per 1,000,000 gallons.

The plaintiff is obliged to maintain a filtration plant to separate this suspended matter from the water before delivering the water to its consumers, and the greater the amount of suspended matter, and particularly the greater the percentage of bacteria, the greater the expense, care, and effort required in insuring the wholesomeness of the water furnished to consumers. The effluent discharged from the filtration plant of the defendants is highly colored and gives out a strong and offensive odor. It is true that, with the exception of the chemicals, which, as stated, are added in the process of filtration, all of the impurities in this effluent have been taken from the river; but they have been taken so far from the bank that it is fairly to be inferred that none of them would have entered the intake of the plaintiff, and, moreover, they are discharged in this concentrated form. The waters of the river are otherwise largely polluted, both above and below the filtration plant of the defendants, and it is impossible to determine with any degree of definiteness the proportion of the entire pollution caused by the defendants; but it is fairly to be inferred that some of the pollution of the water from which plaintiff takes its supply is caused by this discharge of effluent from the filtration plant of the defendants.

There is a trunk sewer in Buffalo avenue, adjacent to the filtration plant of the defendants, into which the effluent from the filtration plant could be discharged as conveniently and with no greater expense than into the river, for the bed of the sewer is upwards of 2 feet lower than the average level of the water in the river at the point of discharge. It is necessary to use pumps, which are installed for that purpose, to completely drain the sedimentation basins through the discharge into the river, and the use of the pumps would not be required to as great an extent to drain the sedimentation basins into the sewer, from which the contents could lawfully be discharged into the river below the falls.

The principal material conflict in the evidence is between the chemists called by the respective parties, and in determining the issues presented by such conflict I accept the testimony of the chemists called by the plaintiff, not, however, upon the theory that the witnesses for the defendants are not entitled to credit, but upon the ground that the witnesses for the plaintiff have had greater experience, and their tests were shown to be more reliable, in that they tested the acidity of the gelatine with which their tests were made, and all of the samples taken by them were produced in court, and their appearance tends to disprove the theory of the defendants that the effluent which they discharged into the river is more free from contamination and pollution than the raw water of the river into which it is discharged, and that in the main the conflict is owing to the difference in the circumstances with respect to the time and place of taking, and the method of identifying and preserving the samples of the water of the river and of the effluent for the tests, and particularly with respect to the stage of the operation of the filtration plant at the time of the taking of such samples.

The competition between the plaintiff and the defendants in supplying the inhabitants of the city with water has resulted in more or

less friction. It is claimed on the part of the defendants that this suit and other actions were brought by the plaintiff for the purpose of coercing the defendants into purchasing the plaintiff's plant and franchise; and, on the other hand, the plaintiff claims that it is at a disadvantage in retaining and obtaining customers for water, owing to the fact that the defendants are in a position to say and do give publicity to the fact that they are discharging the impurities which they take from the water into the river, and that the water taken by the plaintiff is injuriously affected thereby. In the circumstances, it is not improbable that there may be some foundation for these charges and countercharges; but they have not been proved, and there is nothing before the court to warrant a finding that the plaintiff has brought this action for an ulterior purpose, or that either party is acting in bad faith.

[1, 2] The question presented for decision by these facts is whether the plaintiff is entitled to have the defendants enjoined from discharging the effluent from their filtration plant into the river, and leave it to them to provide another outlet therefor through the sewer in Buffalo avenue or otherwise. Of recent years our courts have frequently been called upon to adjudicate concerning the rights of riparian owners with respect to the waters of natural fresh-water lakes and streams, and the established rule is that, while riparian owners do not own the water, each is entitled to a reasonable use thereof, which depends upon the particular facts and circumstances of the case, but must not thereby materially lessen the quantity or alter the quality of the water flowing by his premises, and that these are property rights, protected by the Constitution, of which the owner may not be deprived without just compensation, and if there be no adequate remedy at law without multiplicity of suits, or there be danger that the unreasonable use will ripen into a prescriptive right, a court of equity will afford relief by injunction. Strobel v. Kerr Salt Co., 164 N. Y. 303, 58 N. E. 142, 51 L. R. A. 687, 79 Am. St. Rep. 643; City of New York v. Blum, 208 N. Y. 237, 101 N. E. 869; Butler v. Village of White Plains, 59 App. Div. 30, 69 N. Y. Supp. 193; Mann v. Willey, 51 App. Div. 169, 64 N. Y. Supp. 589, affirmed 168 N. Y. 664, 61 N. E. 1131; Huffmire v. City of Brooklyn, 162 N. Y. 584, 57 N. E. 176, 48 L. R. A. 421; Sammons v. City of Gloversville, 34 Misc. Rep. 459, 70 N. Y. Supp. 284, affirmed 67 App. Div. 628, 74 N. Y. Supp. 1145; Id., 175 N. Y. 346, 67 N. E. 622; Id., 81 App. Div. 332, 81 N. Y. Supp. 466; Chapman v. City of Rochester, 110 N. Y. 273, 18 N. E. 88, 1 L. R. A. 296, 6 Am. St. Rep. 366; Moody v. Village of Saratoga Springs, 17 App. Div. 207, 45 N. Y. Supp. 365, affirmed on opinion below 163 N. Y. 581, 57 N. E. 1118; Seifert v. City of Brooklyn, 101 N. Y. 136, 4 N. E. 321, 54 Am. Rep. 664; N. Y. Rubber Co. v. Rothery, 132 N. Y. 293, 296, 30 N. E. 841, 28 Am. St. Rep. 575; Bolton v. Village of New Rochelle, 84 Hun, 281, 32 N. Y. Supp. 442; Stoddard v. Village of Saratoga Springs, 127 N. Y. 261, 27 N. E. 1030.

As illustrating the rule with respect to the reasonableness of the use of the water, I quote from the opinion of the Court of Appeals in City of New York v. Blum, supra, as follows:

"The question in a nutshell is whether it is reasonable for the defendant to divert the water from its natural channel, and to return it, laden with the excreta of his domestic animals, when he can with slight trouble prevent such pollution. It is unimportant that those animals happen to be ducks. The plaintiff does not seek to prevent the defendant from raising ducks. It merely asks that he shall conduct that business with some regard to the rights of others. He can allow his ducks to have access to the ponds, and by a little labor prevent the pollution of the waters of the stream."

[3, 4] The acts of the defendants are in the nature of continuing trespasses, for which an action at law does not afford an adequate remedy; and while, ordinarily, equity does not intervene to prevent the infliction of merely nominal damages, that rule does not apply to the case at bar, for the reason that in such case nominal damages are deemed substantial, and, moreover, it is evident that there are substantial damages, but it is impossible to·show them with a sufficient degree of certainty to warrant a recovery, and it is not even essential to the maintenance of an action for pollution that damages shall have been suffered if the plaintiff's rights have been invaded and there is danger that such invasion may ripen into a prescriptive right, as there is in the case at bar. Mann v. Willey, supra; Amsterdam Knitting Co. v. Dean, 162 N. Y. 278, 56 N. E. 757; Strobel v. Kerr Salt Co., supra; Townsend v. Bell, 62 Hun, 306, 17 N. Y. Supp. 210; New York Rubber Co. v. Rothery, supra.

It was first contended in behalf of the defendants that the discharge from their filtration plant into the river was authorized by the approval of the plans for the construction of the filtration plant by the state board of water supply; but they were unable to show the approval of the plans providing for the discharge of the waste effluent into the river, or a certificate from the state board of health therefor, as is expressly required by the provisions of section 76 of the Public Health Law, in order to authorize such discharge, and they have also failed to show a permit from the Secretary of War, as required by the provisions of section 13 of the act of Congress of March 3, 1899 (30 Stat. at Large, 1152, c. 425 [U. S. Comp. St. 1913, § 9918]), which renders such discharge into navigable waters, which the waters of Niagara river are, unlawful without such permit.

The defendants, finally, on the submission of the case, claim that, if their acts are unlawful, they cannot ripen into a prescriptive right, and that, therefore, there is no basis for injunctive relief. I agree with the learned counsel for the defendants that acts in express violation of law cannot give rise to prescriptive right. See Brookline v. Mackintosh, 133 Mass. 215; People v. Pelton, 36 App. Div. 450, 55 N. Y. Supp. 815, affirmed 159 N. Y. 537, 53 N. E. 1129. But, as already stated, aside from the question of acquiring a right by prescription there is a basis for equitable jurisdiction, and, moreover, it is possible, although not probable, that permits may be obtained at any time from the state commissioner of health and from the Secretary of War, which would remove the statutory prohibitions.

There is no force in the contention that the action cannot be sustained without joining all parties who are contributing to the pollution of the river, and that since the water is so polluted by others that

even if the discharge of the waste effluent from the filtration plant of the .defendants were stopped, still the plaintiff would be required to filter the water, as doubtless it would. If the plaintiff were seeking to recover damages the extent of the pollution by others would have a material bearing, for defendants would only be liable for the damages caused by themselves; but otherwise these contentions have been frequently made in principle and overruled. Sammons v. City of Gloversville, supra; Chipman v. Palmer, 77 N. Y. 51, 56, 33 Am. Rep. 566; Strobel v. Kerr Salt Co., supra; Butler v. Village of White Plains, supra; Whalen v. Union Bag & Paper Co., 208 N. Y. 1, 101 N. E. 805.

Where, as here, the pollution by the defendants is in violation of express statutory provisions, less evidence of contamination is required to warrant an injunction.in favor of one entitled to use the water, as is the plaintiff. The city of Niagara Falls is rapidly increasing in population, and the contamination of the river by this effluent from the filtration plant of the defendants will naturally be more and more. Without, therefore, expressing an opinion with respect to the right of the plaintiff to injunctive relief against others who are polluting the waters of the river, it is, I think, proper that a court of equity should enjoin a municipality, which is engaged itself in supplying part of its inhabitants with water, from unnecessarily contaminating and polluting the water from which the plaintiff takes its supply for others of the inhabitants of the city, and especially since it is evident that another outlet for the effluent from the filtration plant is available at a very small expenditure. The defendants, however, should have a reasonable time to enable them to construct another outlet.

[5] There is no merit in the further contention that the merger of the Niagara Falls Waterworks Company with the plaintiff was invalid, on the ground that the merger was unauthorized, in that the plaintiff's plant and franchise were in the town of Cheektowaga, Erie county, some 20 miles distant from those of the Niagara Falls Waterworks Company. That point was presented in another action by the plaintiff against the defendants, in which a temporary injunction order was issued for the protection of the plaintiff's rights at Niagara Falls, and that order was sustained, which, I think, must have been upon the theory that the merger with the plaintiff was lawful, or at least was not open to question by the defendants. 158 App. Div. 955, 143 N. Y. Supp. 1150, Case and Points, 4th Dept. Buffalo Law Library, vol. 1201. Moreover, the plaintiff has, since the merger in 1909, exercised the franchises of the Niagara Falls Waterworks Company, and I am of opinion that the people of the state only may question the validity of the merger. The plaintiff did not present a formal complaint, or call upon the defendants to provide another outlet for the discharge from their filtration plant before bringing the action, and in the circumstances I think no costs should be allowed.

Let judgment be entered accordingly, enjoining defendants, during the continuance of plaintiff's leasehold and franchise rights, from discharging the effluent from their filtration plant into Niagara river, but with a provision to the effect that it shall be suspended for the

period of 6 months, to enable defendants to provide another outlet, and with leave to defendants to apply at Special Term, if necessary, for an extension of such period of suspension, if for insufficiency of appropriation of funds or other cause they shall require further time.

Judgment accordingly.